IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RAYCHEL REIFF,

                           Plaintiff,                           OPINION & ORDER

     v.                                                   13-cv-192-jdp

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN-SYSTEM,
and CHRISTOPHER MARKWOOD,

                           Defendant.

Plaintiff Raychel Reiff is a professor of literature at the University of Wisconsin—Superior. She contends that she faced invidious gender discrimination in the early 1990s. But she secured a full-time tenure-track position in 1994, achieved tenure and the rank of associate professor in 1998, and achieved the rank of full professor in 2003. Reiff believes that the effects of that discrimination endure, and that in some recent years she was paid less than her male colleagues as a result. She brings suit alleging violations of the Equal Pay Act, Title VII of the Civil Rights Act, and the Equal Protection clause of the Fourteenth Amendment.

Before the court is defendants' motion for summary judgment. Dkt. 23. The discrimination Reiff may have faced is appalling. But the long-past acts about which Reiff complains were failure-to-promote decisions which do not support her current claim of wage discrimination. Reiff concedes that her starting tenure-track salary was non-discriminatory, and defendants have shown that any disparity between Reiff's compensation and that of her colleagues is not due to sex, but to other compensation adjustments applied without regard to sex, such as seniority, market adjustments, and promotion bonuses. Accordingly, the court will grant defendants' motion for summary judgment. The court will grant, in part, Reiff's motion to strike portions of defendants' reply brief. Dkt. 48. Because defendants did not separately defend

Markwood's liability in their opening brief, that portion of their reply will be disregarded. The other portions of the reply brief do not raise arguments that were new or waived by defendants.

UNDISPUTED FACTS

The following facts are material and, except where noted, undisputed.

The University of Wisconsin—Superior (UWS) is one of the schools administered by defendant Board of Regents of the University of Wisconsin System.[1] Defendant Christopher Markwood worked at UWS as Provost and Vice Chancellor for Academic Affairs and Dean of Faculties from 2006 until 2010, and as Interim Chancellor from 2010 to 2011. Markwood was closely involved in setting UWS faculty salaries from 2006 to 2011.

Reiff was employed as a lecturer at UWS from 1990 to 1994. Although Reiff's experience would have qualified her for a position as assistant or associate professor, she contends that UWS administration told her that she was kept in a lower-paying, non-tenure-track position because she was a married woman who could not readily relocate to take a better position.[2] UWS hired Reiff as a tenure-track assistant professor in the department of Languages and Literature for the 1994-95 academic year. (The department was later restructured, putting Reiff in the "English Department," then in "World Languages, Literatures, and Cultures." For simplicity, the court will refer to Reiff's department as "the literature department.") Her starting tenure-track salary was $34,000, which the parties agree was a non-discriminatory amount for

---

[1] Although the institutional defendant is technically the Board of Regents, in this opinion the court will refer to that defendant as UWS.

[2] Defendants have not substantively disputed Reiff's proposed facts concerning the pre-1994 statements of UWS administrators; they object to Reiff's affidavit evidence of these statements. For purposes of this motion, the court will accept Reiff's version of the pre-1994 events. Because the court is granting defendants' motion for summary judgment, the court need not resolve this evidentiary question.

an assistant professor at the time. The tenure track at UWS is ordinarily five years. Reiff applied for early tenure in 1997 and was denied. In 1998, she was granted tenure (still early) and promoted to associate professor, and she was promoted to full professor in 2003.

Reiff is now the most senior and highest paid faculty member in the UWS literature department. But Reiff contends that in some years she was paid less than male professors in the literature department for the same work despite her equal or superior qualifications. The male colleagues on whose salaries she bases this comparison are Anthony Bukoski (senior to Reiff, now retired), Timothy Crow and Nicholas Sloboda (both junior to Reiff). The salary of a female colleague, Deborah Schlacks, is also invoked for comparison purposes by both Reiff and defendants.

The salary of UWS faculty members is typically adjusted each year. Some adjustments are tied to specific individual career events. For example, in Reiff's case, when she was promoted to associate and then to full professor, she received the standard promotion raises, which were then $1,500 and $3,000, respectively. She received the standard $1,500 raise when she completed the post-tenure review process in summer 2011.

UWS faculty receive adjustments for other reasons, three of which are notable in this case. First, UWS faculty usually receive an annual percentage increase for those who are performing at least "satisfactorily," and sometimes a larger percentage increase for those performing "meritoriously." Although these increases are referred to as "merit" increases, they tend to be distributed across the board so that they have the cumulative effect of rewarding seniority. Reiff, Bukoski, Crow, and Sloboda all received "meritorious" ratings for the years at issue in this case. Second, beginning in 2006, UWS attempted to achieve "external equity" by bringing UWS faculty salaries more in line with salaries at comparable institutions. Based on salary data from the College and University Professional Association for Human Resources

3

(CUPA), UWS instituted a program of what it called "CUPA raises" so that each UWS faculty member's salary would be at least 87% of the average salary at comparable institutions for that member's rank and discipline. Third, UWS adjusted salaries to counteract "compression" and thus to achieve "internal equity." Compression occurs when a university increases starting salaries to attract new faculty, but cannot afford equal increases for existing faculty members. As a result, the salaries of junior faculty may not be much different than those of senior faculty, despite the greater accomplishments and, presumably, value of the senior faculty. In 2008, UWS initiated a multiple year "decompression plan" to award salary increases to faculty based on their years in service to UWS or their years in a particular rank.

UWS faculty are informed of their salaries each year in letters from the chancellor disclosing their salary and the reason for any adjustment.[3] The salary letters do not always fully or accurately explain the basis for every adjustment, but UWS has submitted documents adequate to show the basis for the salary increases for Reiff and the comparator faculty members.

Reiff's claims of discriminatory compensation arise under federal law—the Equal Pay Act, Title VII of the Civil Rights Act, and the Equal Protection clause of the Fourteenth Amendment. Thus, this court has federal question jurisdiction under 28 U.S.C. § 1331.

---

[3] In addition to base salary, faculty can receive additional compensation for extra work (e.g., teaching summer school), sometimes called overload earnings. Overload earnings are not included on salary letters and are not at issue in this case. Although Reiff complains about certain extra work assignments in her affidavit, her briefing has presented no argument based on these assignments, and thus the court will not consider them further.

OPINION

Reiff asserts claims against UWS under the Equal Pay Act and under Title VII of the Civil Rights Act. She asserts a § 1983 claim against Markwood alleging his individual liability for violating her constitutional right to Equal Protection under the Fourteenth Amendment. The showing required for each of these claims is somewhat different, but in the context of this case they all require Reiff to prove the same core allegation: that Reiff was paid less than her male colleagues in the literature department because she is a woman. The court will treat Reiff's claim under the Equal Pay Act as her core claim, because if she cannot establish a violation of the Equal Pay Act, her other claims will also fail.

The Equal Pay Act, 29 U.S.C. § 206(d)(1), prohibits employers from discriminating between employees on the basis of sex by paying different wages for equal work on jobs requiring equal skill, effort, and responsibility, and which are performed under similar working conditions. "To establish a prima facie case under the Equal Pay Act, a plaintiff must show: (1) that different wages are paid to employees of the opposite sex; (2) that the employees do equal work which requires equal skill, effort, and responsibility; and (3) that the employees have similar working conditions." *Fallon v. Illinois*, 882 F.2d 1206, 1208 (7th Cir. 1989) (citations omitted). If plaintiff makes this showing, the burden shifts to defendants to show that the pay disparity is due to: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex. 29 U.S.C. § 206(d)(1)(i)-(iv); *Fallon*, 882 F.2d at 1211. "The fourth affirmative defense (any other factor other than sex) is a broad 'catch-all' exception and embraces an almost limitless number of factors, so long as they do not involve sex." *Fallon,* 882 F.2d at 1211.

Summary judgment is appropriate if defendants show that "there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P.

5

56(a). In ruling on defendants' motion for summary judgment, the court views all facts and draws all reasonable inferences in the light most favorable to Reiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id.* at 248. Reiff was often paid more than some of her male colleagues, but it is undisputed that in some years Reiff made less. It is also undisputed that Reiff and her colleagues did similar work under similar conditions. Thus, at least for some years, Reiff can make a prima facie case under the Equal Pay Act.

The question then is whether defendants can offer explanations other than sex for the pay disparities, and support those explanations with evidence. Defendants contend that no UWS faculty member received any pay adjustment based on sex. Reiff offers two arguments in response. First, Reiff contends that she has adduced direct evidence of sex discrimination in the 1990s, and those past acts of discrimination continue to depress her salary. Second, Reiff contends that UWS paid her male colleagues comparatively large "merit" increases, which masked discriminatory pay increases. For reasons explained more fully below, Reiff's first argument fails because long-past decisions in which Reiff was not hired or promoted to a particular rank do not support her claim of wage discrimination. Her second argument fails because defendants have offered documented explanations for every pay adjustment received by Reiff and her comparators. Reiff has not adduced evidence to create a genuine dispute of fact as to any of the pay adjustments.

**A.  Preliminary matters**

The court will address two preliminary matters before turning to the merits of Reiff's wage discrimination claim.

1. **Reiff's motion to strike**

Reiff asks the court to strike portions of defendant's reply brief relating to three issues: the nexus between recent paychecks and past discrimination; whether CUPA adjustments are gender neutral; and Markwood's individual liability. Reiff contends that each of these issues is at best minimally developed in defendants' opening brief and should thus be deemed waived. New issues cannot be raised in a reply brief. *Darif v. Holder*, 739 F.3d 329, 336-37 (7th Cir. 2014). Arguments that are inadequately developed in an opening brief may also be forfeited. *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011).

Reiff is correct with respect to defendants' argument that Markwood is not personally liable under § 1983 based on his lack of personal involvement. Defendants' opening brief denies any discrimination at all, but it does not separately defend Markwood. The court will disregard defendants' argument about Markwood's lack of personal involvement, and grant Reiff's motion in that regard.

But Reiff's motion is otherwise denied. Defendants' argument that the discrimination faced by Reiff in the 1990s is too remote from any pay disparity within the limitations periods is a proper response to Reiff's argument in her summary judgment opposition, which relies heavily on events in the 1990s. As for the CUPA increases, defendants' opening summary judgment submission offered the CUPA increases as a non-discriminatory reason for pay disparities. Defendants provided additional argument in response to Reiff's opposition contesting the point. Defendants' reply argument on these two points is proper and did not sandbag Reiff.

## 2. Statute of limitations

Part of the statute of limitations question is straightforward and undisputed, but it raises a more complex legal dispute that goes to the heart of Reiff's case. The issue is whether Reiff can base her wage discrimination claim on hiring and promotion decisions made by UWS in the 1990s, long before the limitations periods applicable to her claims.

First, the straightforward part. The parties agree on the applicable limitations periods. The statute of limitations for a claim under the Equal Pay Act is two years, unless the violation is willful. 29 U.S.C. § 255(a). Reiff does not assert willfulness, so the two-year statute of limitations applies. Because the complaint was filed on March 18, 2013, the limitations period for her Equal Pay Act claim began on March 18, 2011. The statute of limitations for Reiff's Title VII claim is 300 days, which runs from the filing of a complaint with the Equal Rights Division. 42 U.S.C. § 2000e-5(e)(1). Because Reiff filed a discrimination charge with the Equal Rights Division on October 13, 2009, the limitations period for her Title VII claim began on December 17, 2008. Finally, the statute of limitations for an equal protection claim under 42 U.S.C. § 1983 is six years. Based on the filing of the complaint, the limitations period began on March 18, 2007. Thus, if she were successful on all claims, Reiff could recover damages for discriminatory pay she received since the earliest limitation date, March 18, 2007.

The parties also agree that a wage discrimination plaintiff is entitled to what is sometimes referred to as the "paycheck accrual rule": a fresh claim for wage discrimination accrues with each discriminatory paycheck, even if the discriminatory compensation decision occurred before the limitations period. The rule has a notable history, because it was rejected by the Supreme Court in *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), but reinstated by Congress in the Lilly Ledbetter Fair Pay Act of 2009. Thus, Reiff could recover for any discriminatory pay she received within the limitations period, even if the initial

8

discriminatory compensation decision occurred before the limitations period. The paycheck accrual rule is applicable to claims of wage discrimination brought under the Equal Pay Act as well as those brought under Title VII and § 1983. *Groesch v. City of Springfield, Ill.*, 635 F.3d 1020, 1027 (7th Cir. 2011).

Now the dispute. Reiff contends that her discriminatory compensation stems, at least in part, from three decisions in the 1990s: the decision in 1993 to employ her as an lecturer rather than in a tenure-track position; the decision in 1994 to hire her at the rank of assistant rather than associate professor; and the decision in 1997 to deny her promotion to associate rank. Each of these decisions, Reiff argues, had the effect of depressing her compensation over the course of her career, including within the limitations periods starting in 2007. Reiff asserts that each of these discriminatory decisions put her behind Bukoski in years of service and years in rank and that each year she lost money when UWS faculty received percentage-based merit increases. Reiff's argument fails for two reasons.

The first reason is that the 1993, 1994, and 1997 decisions are failure-to-promote decisions. Such decisions are not "discrimination in compensation" decisions within the meaning of the Equal Pay Act, as amended by the Lilly Ledbetter Fair Pay Act. They do not give rise to discriminatory compensation claims that are refreshed with each new discriminatory paycheck. Although the question of whether a failure-to-promote decision can be the basis for a discriminatory compensation claim is an open question in the Seventh Circuit, the three circuits that have considered the issue have concluded that untimely failure-to-promote claims do not give rise to wage discrimination claims. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 630– 31 (10th Cir. 2012); *Noel v. Boeing Co.*, 622 F.3d 266, 273 (3d Cir. 2010); *Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 375 (D.C. Cir. 2010). The reasoning in these cases is persuasive, and the court is not aware of any circuit decision going the other way.

The Lilly Ledbetter Fair Pay Act was enacted to overrule the harsh result in the Supreme Court's *Ledbetter* decision, which held that Lilly Ledbetter's wage discrimination claim was untimely before she had even discovered that her male colleagues were paid more than her for the same work. The findings section of the Lilly Ledbetter Fair Pay Act states that Congress intended to reverse the *Ledbetter* decision. Pub. L. No. 111–2, § 2, 123 Stat. 5 (2009). Congress's response was to add the following section to Title VII:

> [A]n unlawful employment practice occurs, *with respect to discrimination in compensation* in violation of this subchapter, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

42 U.S.C. § 2000e–5(e)(3)(A) (emphasis added). The Lilly Ledbetter Fair Pay Act applies to a "discriminatory compensation decision or other practice." The circuits that have considered this issue conclude that this phrase includes only discriminatory compensation decisions and practices that result in similarly situated employees being paid differently for the same work. The phrase does not apply generally to any discriminatory decision that might secondarily affect compensation, such as a failure to promote an employee to a more remunerative position. Three reasons support this conclusion.

The first reason is textual: the added section states that it applies to unlawful practices "*with respect to discrimination in compensation.*" It does not state that it is applicable to any act of discrimination in the terms and conditions of employment. In light of this initial limitation of the act to discrimination in compensation, the term "other practice" does expand the scope of the act to apply to all employment discrimination decisions. Nor does interpreting the act to be

so limited read the phrase "other practice" out of the act. As the *Schuler* court pointed out, Ledbetter's case provides a good illustration of an "other practice" giving rise to a compensation claim. Ledbetter received discriminatory poor performance evaluations because she was a woman, and the poor evaluations were used pretextually to justify her lower pay. *Schuler*, 595 F.3d at 375.

The second reason is policy based, and it was well articulated by Justice Ginsburg in dissent in *Ledbetter*. "Pay disparities are thus significantly different from adverse actions 'such as termination, failure to promote, . . . or refusal to hire,' all involving fully communicated discrete acts, 'easy to identify' as discriminatory." *Ledbetter*, 550 U.S. at 645 (Ginsburg, J., dissenting) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, (2002)). As Lilly Ledbetter's case demonstrates, pay decisions are often privately made and confidential, making pay disparities generally harder to discover than disparities involving more public adverse actions such as terminations or failures to hire or promote.

The third reason concerns the structure of Title VII, which includes extensive provisions relating to administrative remedies and strict deadlines for filing claims. If the Lilly Ledbetter Fair Pay Act were made applicable to all discriminatory adverse employment decisions, it would effectively abrogate the administrative scheme and the related deadlines set out in § 2000e–5(e)(1). In sum, the Lilly Ledbetter Fair Pay Act reinstated the paycheck accrual rule for discriminatory compensation decisions applied to similarly situated employees doing the same work. But it does not express Congressional intent to launch a "limitations revolution for any claim somehow touching on pay." *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1182 (10th Cir. 2011).

The court concludes that Reiff's claims based on the UWS decisions in 1993, 1994, and 1997 are time-barred. These were failure-to-promote decisions. None of them constitute a

"discriminatory compensation decision or other practice," and thus they do not give rise to a fresh cause of action with every paycheck issued to Reiff. Indeed, Reiff's case demonstrates vividly the danger of coming out the other way on this issue: UWS would be called upon to defend 20-year-old decisions concerning Reiff's professorial rank, when Reiff herself was fully aware of her claim and most of the evidence supporting it as soon as those decisions were made. Given the practical realities of university tenure and promotion decisions, courts are appropriately reluctant to reverse those decisions even on a fresh record. *Blasdel v. Nw. Univ.*, 687 F.3d 813, 815 (7th Cir. 2012). The passage of 20 years would make meaningful review of such a decision exponentially more complicated. Nothing in the text or history of the Lilly Ledbetter Fair Pay Act suggests that Congress intended that any claim of discrimination that had an arguable impact on compensation would be perpetually refreshed so long as the employee stayed with the same employer.

There is a second reason that Reiff's claims based on a failure-to-promote fail, even if such claims were not time-barred. The issue is causation: can Reiff show that the discrimination she faced in 1993, when her hiring on the tenure track was delayed by one year, continued to affect her compensation in 2007, when a limitations period starts? The answer would be "yes" if UWS had a simple lock-step seniority system in which a faculty member's pay inevitably went up by a fixed amount every year. But the record shows that this is not the case. Defendants have shown, and documented, that simple seniority alone is not determinative of UWS faculty pay. UWS faculty salaries are set by multiple factors that would make it impossible for a reasonable jury to conclude that Reiff's salary as a full professor in 2007 was diminished by her being hired to a tenure-track position in 1994 instead of 1993, or her promotion to associate in 1998 instead of 1997 (or even 1994). There are simply too many intervening pay adjustments in the 16 years between the discriminatory acts and the opening of the limitations period in 2007. The

12

2006 plan involving CUPA raises is particularly significant in this regard, because pay adjustments under that plan had the effect of equalizing pay according to rank and discipline without regard to seniority. There are many other such adjustments: a 1997 adjustment "to partially address faculty salary inequities . . . based on an individual's deviation from the median rank salary for faculty at the Comprehensive UW institutions"; a 1998 adjustment to correct salary inequities based on "comparisons among the salaries of UW-Superior faculty and teaching Academic Staff with similar experience and credentials;" two compression adjustments in 2000; a 2004 parity adjustment; a 2007 equity/compression adjustment; and a 2010 equity/compression adjustment. Dkt. 26-4. No reasonable jury could conclude that Reiff's post-2007 salary was affected by events in 1993, 1994, and 1997, after multiple pay adjustments, promotions, equity initiatives, and budget limitations.

But Reiff's case is not doomed just because she cannot base her claim on the events of 1993, 1994, and 1997. She has pointed out pay differentials—within the limitations periods—in which she made less than men in her department, sometimes less even than men who were junior to her. Accordingly, the court turns to the merits of her claim under the Equal Pay Act.

## B. Equal Pay Act

The Equal Pay Act, 29 U.S.C. § 206(d)(1), prohibits employers from discriminating between employees on the basis of sex by paying different wages for equal work on jobs requiring equal skill, effort, and responsibility, and which are performed under similar working conditions. "To establish a prima facie case under the Equal Pay Act, a plaintiff must show: (1) that different wages are paid to employees of the opposite sex; (2) that the employees do equal work which requires equal skill, effort, and responsibility; and (3) that the employees have similar working conditions." *Fallon v. Illinois*, 882 F.2d 1206, 1208 (7th Cir. 1989) (citations

omitted).

Reiff makes out a prima facie case. At various times, male professors Bukoski, Crow, and Sloboda had higher base salaries than Reiff. The chart below provides the base salaries of Reiff and her comparators within the limitations periods:

| | Reiff | Bukoski | Crow | Sloboda |
|---|---|---|---|---|
| 03/29/2007 | 59,684 | 61,879 | 50,988 | 49,165 |
| 08/27/2007 | 60,878 | 63,117 | 55,068 | 53,208 |
| 08/25/2008 | 61,281 | 63,783 | 58,475 | 56,839 |
| 08/24/2009 | 61,281 | 63,783 | 63,925 | 61,439 |
| 08/26/2010 | 62,645 | 64,881 | 63,925 | 61,439 |
| 08/29/2011 | 64,145 | N/A[4] | 63,925 | 61,439 |
| 08/26/2013 | 64,786 | N/A | 64,564 | 62,053 |

With respect to factors (2) and (3), defendants concede that Reiff is comparable to professors Bukoski, Crow, and Sloboda. Dkt. 29, at 20 n.6. All three male professors had higher base salaries than Reiff in the one-year period from August 24, 2009, to August 25, 2010. Thus, Reiff has shown that different wages were paid to employees of the opposite sex, and those employees all did similar work under similar conditions.

Defendants make two unpersuasive arguments against Reiff's prima facie case. First, defendants cite some case law in support of the notion that very small wage differentials indicate that such differences are likely due to factors other than sex. Dkt. 29, at 9. But the pay differences Reiff shows are not de minimis, and even a small wage differential based on sex is unlawful. *King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 473 (7th Cir. 2012). Second, in a footnote, defendants contend that payments Reiff received for additional service to UWS make it "questionable whether she can state any EPA claim at all." *Id.* at 9 n.1. UWS faculty may receive overload compensation for additional work, such as teaching summer school. Defendants

---

[4] Bukoski retired on June 29, 2011.

cannot defeat Reiff's case if Reiff equaled her comparators salaries only by taking on additional duties. For purposes of this case, the court will consider only the base salaries earned by Reiff and her comparators.

Because Reiff has made her prima facie case, the burden shifts to defendants to show that the pay disparity is due to: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex. 29 U.S.C. § 206(d)(1)(i)-(iv); *Fallon*, 882 F.2d at 1211. "The fourth affirmative defense (any other factor other than sex) is a broad 'catch-all' exception and embraces an almost limitless number of factors, so long as they do not involve sex." *Fallon*, 882 F.2d at 1211. Defendants argue that the comparators' salaries were higher than Reiff's salary because of Bukoski's greater years of service and, as to Crow and Sloboda, because of UWS's efforts to correct internal and external inequities.

### 1. Reiff compared to Bukoski

Bukoski's salary was always higher than Reiff's salary during the limitations period, until Bukoski's retirement in 2011. Defendants contend that this pay disparity occurred because Bukoski began his tenure-track position at UWS in 1988, six years before Reiff. As a result of the usual annual merit increases and his earlier achievement of promotion and the resulting increases, Bukoski was paid more than Reiff for reasons unrelated to sex.

Reiff concedes that years of service is a "factor other than sex" that would support an affirmative defense, but she argues that the defense fails in this case because defendants cannot identify any formal seniority or longevity system, procedure, or process at UWS. Dkt. 40, at 7. Reiff contends that because Bukoski received raises for internal and external equity reasons, his salary is not simply a matter of seniority.

15

Reiff is correct that Bukoski's salary is not *simply* a matter of seniority. But Reiff's overall argument is contradictory and self-defeating. She contends that because she was put on the tenure-track six years after Bukoski as a result of discriminatory decisions in 1993 and 1994, she lost out on years of service and years in rank. Dkt. 40, at 9. Her theory as to why the 1993 and 1994 decisions harmed her is essentially that she lost seniority as a result. Reiff cannot have it both ways, appealing to the effect of seniority to explain her injury, but then denying the effect of seniority as an explanation for Bukoski's greater salary.

Reiff makes a somewhat better argument that greater seniority at UWS does not guarantee greater pay. She points to Markwood's deposition to show that UWS lacks a formal seniority system. Markwood testified that UWS did not "guarantee that just because you were hired first you're always going to be paid the most." Dkt. 15, at 72-73. The Rate and Jobcode History document, Dkt. 35-1, shows that indeed Bukoski received a variety of raises in addition to the annual percentage-based merit increases. But this evidence is inadequate to establish Reiff's claim of wage discrimination for two main reasons.

First, defendants have submitted evidence to demonstrate that none of the promotion or equity raises were determined by gender. This evidence is discussed in detail below with respect to Crow and Sloboda. The promotion raises, the CUPA raises, and the compression adjustment plan were all implemented without regard to gender. The second reason that Reiff's argument fails is that she, like Bukoski, also received promotion raises, CUPA raises, and the benefits of the compression adjustment plan.

The only argument Reiff makes with respect to her pay in comparison to Bukoski is that she should have been hired on the tenure track sooner. But the court has already rejected this argument as time-barred, and the CUPA raises tended to equalize faculty members in the same rank and discipline. The only reasonable inference to be drawn from the evidence is that

16

Bukoski's salary was marginally greater than Reiff's for reasons predominately related to his greater seniority, and in any case, for reasons other than sex. Reiff has adduced no evidence to show that any of Bukoski's salary adjustments were applied in a sex-biased manner.

### 2. Reiff compared to Crow and Sloboda

The court will consider Crow and Sloboda together because the parties' arguments concerning these two comparators are essentially identical. Reiff contends that Crow and Sloboda got much larger "merit" increases than she and Schlacks, and that the reasons were discriminatory. Defendants' explanation is that Crow and Sloboda's salary increases were not discretionary merit increases, but were the result of systematic processes applied across the board to all faculty, based on their rank and discipline. Defendants further explain that Crow and Sloboda's salaries were temporarily higher than Reiff's salary only because their post-tenure reviews occurred before Reiff's post-tenure review.

The court's analysis is based primarily on three sets of documents: the salary letters to faculty (Dkts. 26-3, 26-4, 26-5, 26-6, 26-7); the Rate and Jobcode History (Dkt. 35-1), which lists the rank and salary adjustments for each faculty member; and other pay plan documents (Dkt. 26-10, 26-11, 26-13, 26-14) which provide details about the implementation of the CUPA raises and the compression plan. The analysis is complicated by the fact that neither the faculty salary letters nor the Rate and Jobcode History consistently use the same labels to identify the increases received by faculty members. The court concludes that the confusion engendered by the salary letters does not create a genuine dispute of material fact because the record, taken as a whole, explains the basis for each increase received by Reiff and her comparators, and none of those increases was given as a result of sex.

### a.   2007 CUPA adjustments

Other than the hiring and promotion decisions in the 1990s, Reiff makes no complaint about specific pay decisions before 2008. But the court starts the analysis at 2007, the first year of the CUPA adjustments.

UWS administration (with significant faculty input) resolved to bring UWS faculty salaries within 87% of the CUPA average for each professor's rank and discipline. The first adjustments occurred in early 2007, based on CUPA data from 2005. The CUPA average for full professors in Reiff's discipline, English Language and Literature/Letters, was $66,123, which means that her 87% target was $57,527. Although Crow was in Reiff's department, as a professor of a foreign language, Crow was in a different discipline in the CUPA comparison. The 87% target for a full professor in his discipline was $61,281.

Reiff (and Schlacks) received CUPA adjustments. Reiff received a raise of $1,773, which is the difference between $57,527 (the 87% target) and $55,754 (her August 2005 base salary). Crow and Sloboda, who were not yet full professors, did not receive CUPA adjustments in early 2007 because their salaries, although lower than Reiff's, were above 87% of the target for their rank and disciplines.

### b.   2007-08 pay adjustments

The UWS 2007-08 pay plan included raises based on merit, not CUPA; the amount was based on a standard percentage of base salary. Crow and Sloboda were promoted in 2007 to the rank of professor and they received the standard $3,000 increase. Reiff, Crow, and Sloboda each received 2% of their base salary. These standard raises were not based on sex.

18

c.    2008-09 pay adjustments

Reiff focuses particularly on pay adjustments for 2008-09. Reiff contends, essentially, that Crow and Sloboda received significant discretionary "merit" increases that masked UWS's discriminatory pay decisions. The salary letters cause confusion on this point because in Crow and Sloboda's letters, the CUPA increases are lumped together with their merit increases, which were much smaller.

The 2008-09 pay adjustments were described in nearly identical salary letters dated July 1, 2008, to Reiff, Crow, and Sloboda. Dkt. 26-4; Dkt. 26-6; Dkt. 26-7. The letters explained that the UW System would provide an average increase of 3%, which would be provided in two phases, with 1% in July 2008 and the remaining 2% in June 2009. At UWS, two-thirds of the available amount would applied to merit increases for those achieving satisfactory or meritorious ratings,[5] and one-third would be used to address compression. For the first phase, the letters indicted that Reiff was to receive $403, Crow $3,407, and Sloboda $2,739—all categorized as "Solid Performance/Merit (Phase I)." All three received these raises on the same day and in accordance with the effective dates in the letters (August 25, 2008). Although the letters do not make this clear, even though Reiff received a lesser increase, it was the result the systematic application of the CUPA plan, not a difference in the discretionary merit increase.

Before the raise, Reiff's base salary was $60,878. Her 2% merit increase equaled $1,217.56; she received approximately one-third of this amount, $403, as her Phase I raise. In like manner, Crow and Sloboda received Phase I merit raises of approximately $367 and $361[6]

---

[5] Professors with a satisfactory rating received two-thirds of the 2% increase, and those with a meritorious rating received the full 2%. Reiff, Crow, and Sloboda were rated meritorious.

[6] The actual increase for Sloboda was slightly different because he also got a $892 adjustment to meet a mandatory minimum salary requirement for his rank imposed by the UW System. Reiff does not contend that this mandatory minimum adjustment was discriminatory.

respectively. The additional increases for Crow and Sloboda were CUPA adjustments. The promotion of Crow and Sloboda to full professors placed them below the 87% CUPA target for their new rank and disciplines. Crow would have been entitled to a $9,192 raise from his August 2005 base salary of $52,089 to bring him within the 87% target. Sloboda would have been entitled to a $7,194 raise from his August 2005 base salary of $50,333 to bring him within the 87% target. But neither Crow nor Sloboda immediately got the full amount of the CUPA increase; they got one-third of the amount in Phase I. (As it turns out, the Phase II adjustments came later than planned because of budget cuts during a Wisconsin fiscal crisis, and only a portion of the adjustments was given.)

Reiff argues that the labels on the salary letters are enough to create a dispute of fact as to the basis for Crow and Sloboda's 2008 increases. But the record demonstrates that the salary letters do not fully explain the basis of the increases. For example, when Reiff received her $1,773 CUPA adjustment in 2007, it was labeled in her salary letter as "Equity/Compression." When Crow and Sloboda received the Phase I raises and, later, 65% of the Phase II raises, the raises were labeled differently, as "Solid Performance/Merit" and "Equity/Compression," respectively. The salary letters alone simply do not explain the basis for the pay adjustments. But the other UWS pay plan documents provide the underlying explanation, showing that the increases were the result of systematic salary plans applied without regard to sex. Reiff has adduced no evidence to dispute the explanations that UWS has documented.

### d.    2009-10 pay adjustments

The July 15, 2009, salary letters explained to Reiff, Crow, and Sloboda that their salaries

would not change for fiscal year 2010: "Governor Doyle announced that he will revise his budget proposal to rescind the second phase of the merit increase." Dkt. 26-4; Dkt. 26-6; Dkt. 26-7. Reiff again raises the issue with the use of the term "merit," but she adduces no evidence to show that any pay adjustment was not systematically applied without regard to sex.

###### e.   2010-11 pay adjustments

The July 28, 2010, salary letters for Reiff, Crow, and Sloboda announced increases labeled as "Equity/Compression Adjustment (since 7/01/09)." Dkt. 26-4; Dkt. 26-6; Dkt. 26-7. But this label includes different adjustments. Crow and Sloboda (and other professors who are not comparators in this litigation) received 65% of their Phase II adjustment from fiscal year 2009. Reiff's adjustment, by contrast, included a decompression adjustment. The amounts are: Reiff $1,364; Crow $3,950; and Sloboda $3,100.[7]

In addition, Crow and Sloboda's July 2010 salary letters include increases of $1,500 categorized as "Post-Tenure Review Adjustment (since 7/01/09)." Post-tenure review is a process that tenured professors ordinarily undergo every five years to assess their continued contribution to UWS in teaching, scholarship, and service. The program was suspended from 2006 until early 2009, when Reiff, Bukoski, and Schlacks would have been due for review. When UWS re-initiated the post-tenure review process in 2009, it added the benefit of a $1,500 salary increase for those who successfully complete the process. In an attempt to get post-tenure review back on a regular schedule, it undertook review of faculty who were then in their sixth year post-tenure and due for review. Thus, Crow and Sloboda had their post-tenure reviews in 2009 (their sixth

---

[7] Crow's increase was calculated by: adding the 2009 Phase I and Phase II amounts; subtracting the 2% merit adjustment; taking two-thirds of the result; and taking 65% of that result. Sloboda's increase was calculated in the same manner.

year after tenure), and they received the accompanying $1,500 salary increase on August 24, 2009.[8] Faculty who would have been reviewed while the program was suspended received their post-tenure reviews on a variable schedule. The record does not make clear exactly how post-tenure reviews were scheduled for those faculty, but Reiff has adduced no evidence to show that the timing of her post-tenure review was due to her sex. Reiff received post-tenure review in 2011 (her fifteenth year after tenure), and received a $1,500 raise as a result.

### f.    2011-12 pay adjustments

The parties did not enter the fall 2011 salary letters into the record. Based on the figures available to the court, the salaries of Reiff, Crow, and Sloboda did not change in fiscal year 2012.

### g.    2012-13 pay adjustments

On August 29, 2011, Reiff received the $1,500 post-tenure review adjustment, bringing her new salary to $64,145. Neither Crow nor Sloboda's 2012 salary letters include any pay adjustments. Dkt. 26-6; Dkt. 26-7. From that date forward, Reiff's salary was higher than both Crow's and Sloboda's.

## C.  Title VII Gender Discrimination

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national

---

[8] The effective date was July 1, 2009, but Crow and Sloboda's paychecks did not reflect the salary increase until August 24, 2009.

origin." 42 U.S.C. § 2000e–2(a)(1).

Reiff's argument in support of her Title VII claim relies almost entirely on alleged acts of discrimination from the 1990s. Dkt. 40, at 18-22. For the reasons given above, discrimination claims arising from these acts are time-barred.

To the extent that Reiff bases her Title VII claim on the theory that she has received discriminatory pay during the limitations period, that claim fails because UWS has shown that any pay differential between Reiff and her comparators is due to factors other than sex. Thus, her Title VII claim fails for the same reason her Equal Pay Act claim fails. *See Fallon*, 882 F.2d at 1214 (noting that in *Covington v. Southern Illinois University*, 816 F.2d 317, 321 (7th Cir. 1987), both claims could not succeed because the employer "successfully defended on the ground that a factor other than sex explained the pay disparity"); *Patkus v. Sangamon-Cass Consortium*, 769 F.2d 1251, 1260 n.5. (7th Cir. 1985) ("Title VII and the Equal Pay Act are to be construed 'in harmony.' . . . Since the four statutory defenses available under the Equal Pay Act also serve as valid defenses to a claim based on Title VII [and] since we hold that defendants have successfully established a defense to the Equal Pay Act claim, there is no need to address the separate Title VII claim of discrimination in pay.") (internal citations omitted).

## D. Section 1983

Reiff's claim under 42 U.S.C. § 1983 is based on Markwood's individual liability. Markwood must have "knowingly, willfully, or at least recklessly" caused harm to Reiff "by his action or failure to act." *Rascon v. Hardiman*, 803 F.2d 269, 273-74 (7th Cir. 1986). In light of the court's decisions on Reiff's Equal Pay Act and Title VII claims, there is no actionable discrimination, and thus no equal protection violation, for Markwood to be liable for. The court will grant defendants' motion for summary judgment on Reiff's § 1983 claim.

CONCLUSION

UWS has explained the nature of the salary adjustments received by Reiff and each of her comparators, and it has documented those explanations with evidence concerning the various salary initiatives undertaken by UWS. Reiff cannot base a valid claim on promotion decisions from the 1990s, and she has adduced no evidence to create a genuine dispute of fact concerning any of the post-2006 salary initiatives or the resulting salary adjustments. The record shows that none of the salary adjustments at UWS were made on the basis of sex. Defendants are entitled to summary judgment.

ORDER

IT IS ORDERED that:

1)  Defendants' Motion for Summary Judgment, Dkt. 23, is GRANTED; and

2)  Plaintiff's Motion to Strike, Dkt. 48, is GRANTED in part, and DENIED in part, as provided in the opinion.

3)  The clerk is ordered to enter judgment for defendants and close this case.

Entered this 12th day of September, 2014.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge